Daniel C. Girard (State Bar No. 114826)
Jordan Elias (State Bar No. 228731)
Adam E. Polk (State Bar No. 273000)
Elizabeth A. Kramer (State Bar No. 293129)
**GIRARD GIBBS LLP**
601 California Street, Suite 1400
San Francisco, California 94108
Telephone: (415) 981-4800
Facsimile:  (415) 981-4846
Email: dcg@girardgibbs.com
Email: je@girardgibbs.com
Email: aep@girardgibbs.com
Email: eak@girardgibbs.com

*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHANNON LEE O'CONNER on behalf of herself and all others similarly situated,<br><br>                    Plaintiff,<br>      v.<br><br>UNIVERSITY OF SOUTHERN CALIFORNIA, BOARD OF TRUSTEES OF THE UNIVERSITY OF SOUTHERN CALIFORNIA, and GEORGE TYNDALL, M.D.,<br><br>                    Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

Plaintiff Shannon Lee O'Conner, individually and on behalf of all women who were examined by George Tyndall, M.D. at the University of Southern California, alleges as follows.

## NATURE OF THE CASE

1.      Shannon O'Conner is one of many women who visited Tyndall for a gynecological examination at USC's student health center.  Tyndall caused lasting damage to her and other women who sought medical services while attending USC, through conduct that included sexually assaulting them while conducting gynecological examinations, requiring them to disrobe unnecessarily, and making lewd, sexually offensive remarks during the examinations.

2.      USC breached its duties to Ms. O'Conner and other female students by keeping Tyndall on staff from 1989 to 2016 despite receiving repeated and continuous complaints about his conduct towards patients.  USC nurses and medical assistants attended Tyndall's examinations and observed his predatory behavior, but did nothing to stop it.  USC supervisors and administrators learned of Tyndall's misconduct, including from numerous student complaints, yet took no action to protect its female students from him.  A recent USC investigation concluded that "[s]everal of the complaints were concerning enough that it is not clear today why the former health center director permitted Tyndall to remain in his position."  On May 25, 2018, USC's president resigned, and its Board of Trustees acknowledged that "something is broken" in regard to the university's response to Tyndall's wrongdoing.

3.      Ms. O'Conner brings this action on behalf of herself and the other women who were subjected to Tyndall's examinations.

## JURISDICTION AND VENUE

4.      The Court has original jurisdiction pursuant to 28 U.S.C. § 1331 based on Plaintiff's claim under Title IX of the federal civil rights laws.  In addition, pursuant to 28 U.S.C. § 1367, the Court has supplemental jurisdiction over Plaintiff's remaining claims, which arise under California law.  The Court also has jurisdiction over this

1

CLASS ACTION COMPLAINT
CASE NO.

lawsuit under the Class Action Fairness Act, 28 U.S.C. § 1332, because this is a proposed class action in which: (1) there are at least 100 class members; (2) the combined claims of class members exceed $5,000,000, exclusive of interest, attorneys' fees, and costs; and (3) Plaintiff and Defendants are domiciled in different states.

5.    The Court has personal jurisdiction over USC and its Board of Trustees (together, the "USC Defendants") because Tyndall examined Plaintiff and other women who make up the proposed class in California, USC's principal place of business is in California and the USC Defendants have sufficient minimum contacts with California to render the exercise of jurisdiction by this Court proper and necessary.

6.    The Court has personal jurisdiction over Tyndall by virtue of his citizenship of and residency in California.

7.    Venue is proper in this District under 28 U.S.C. § 1391.  A substantial part of the events and omissions giving rise to the claims occurred in this District.

## PARTIES

8.    Plaintiff Shannon Lee O'Conner is a citizen and resident of Harris County, Texas.

9.    Defendant USC is a California corporation whose principal place of business is in Los Angeles County, California.  Defendant Board of Trustees of the University of Southern California governs USC and its operations.

10.    Defendant George Tyndall, M.D. is a citizen and resident of Los Angeles County, California.  Tyndall began work as a gynecologist at USC's student health center in 1989.

## FACTUAL ALLEGATIONS

### A.    Plaintiff Was Assaulted by Tyndall.

11.    Shannon O'Conner was an undergraduate student at USC in the early 1990s, and was enrolled in a USC student health plan.  In or around the spring of 1993, she made an appointment at the student health center.

CLASS ACTION COMPLAINT
CASE NO.

12.     When Ms. O'Conner arrived at the clinic, she was taken to an exam room and told to take off all of her clothes and put on a gown.  Tyndall soon came into the room, and told her to lie down and place her legs in elevated stirrups.  He told her to spread her legs, which she did.  He immediately began thrusting his fingers inside her vagina and moving them in and out rapidly.  She reacted by pulling her hips back, but Tyndall grabbed her hip with one hand and forcibly pressed it down to the exam table while continuing the in-and-out motion with the fingers from his other hand.

13.     Tyndall then asked Ms. O'Conner if she had a boyfriend.  She responded that she did.  Tyndall then said that Ms. O'Conner's boyfriend must love her vagina.

14.     During this conversation, Tyndall was moving his ungloved fingers in and out of Plaintiff's vagina, hooking them upward in an attempt to arouse her.

15.     Ms. O'Conner panicked and said that her mother had told her a female nurse needed to be in the room.  Tyndall replied that there was no need for a nurse, but Ms. O'Conner insisted.  Tyndall stood up, walked to the door, and called for a nurse.  A woman wearing medical scrubs and a dark green cardigan sweater came into the room.

16.     Tyndall said, "Okay, now you've got a nurse in the room," and sat back down on his stool.  The nurse seated herself in a chair and read a paperback while Tyndall continued the examination.

17.     Tyndall pulled Ms. O'Conner's knees apart and placed his fingers back inside of her.  She was shaking.  He put one of his hands on her hip and held it down.  He continued to move his ungloved fingers in and out of her, using two and sometimes three fingers, hooking them upward as if trying to stimulate her sexually.

18.     After several minutes, Tyndall aggressively inserted a speculum and swabbed Ms. O'Conner's cervix.  He then told her the exam was over and that she could get dressed.  He left the room, followed by the woman in the green sweater.  Over the course of the appointment, Tyndall never explained what he was doing or why.  The woman never said anything to Ms. O'Conner.

3

CLASS ACTION COMPLAINT
CASE NO.

19.    Ms. O'Conner dressed and left the exam room.  She approached the female receptionist at the front desk and told her that the doctor had said sexual things to her and that the exam didn't feel right.  The receptionist replied that Ms. O'Conner was a pretty girl and should get used to stuff like that.

20.    Ms. O'Conner never went back to the student health center for another gynecological examination.  She attempted to suppress her memory of Tyndall's examination, and avoided being examined by male gynecologists.

21.    Because a nurse or medical assistant sat silently in the room as Tyndall abused her, and because Tyndall was a permanent employee of USC's medical facility, Ms. O'Conner reasonably believed at the time that Tyndall's examination fell within the bounds of a legitimate medical treatment, although she now knows that Tyndall's conduct was sexual abuse.

22.    When news of Tyndall's predatory behavior emerged in May 2018, Ms. O'Conner recognized Tyndall's face.  She realized, for the first time, that Tyndall's actions were sexual assaults.  Her realization that Tyndall's examination was a sexual assault has caused her to experience harm as alleged below, including severe psychological and emotional distress.

**B.    USC Had Notice of Tyndall's Misconduct.**

23.    Hired in 1989, Tyndall served as USC's only full-time gynecologist for many years.  Complaints of his misbehavior toward female patients began in the early 1990s, before he assaulted Plaintiff in the spring of 1993.

24.    Many of the women who visited Dr. Tyndall at USC's student health center received their first gynecological examination from him and thus had no way of knowing that his conduct was out of the ordinary.

25.    Tyndall occupied a position of trust and confidence in relation to his student-patients.  He exploited that position by sexually abusing, molesting, and harassing Plaintiff and hundreds of other women.

CLASS ACTION COMPLAINT
CASE NO.

26.    A female nurse, or a medical assistant known as a "chaperone," frequently joined Tyndall in the exam room when he was examining women.

27.    Early in Tyndall's tenure at USC, during 1990 and 1991, chaperones questioned why he was taking so many photographs of female patients' genitalia during pelvic exams.  One chaperone said she saw Tyndall take photographs of more than 50 women's genitalia.  After a chaperone told administrators about Tyndall photographing patients, Lawrence Neinstein, who at the time was the executive director of USC's student health center, ordered Tyndall to stop bringing a camera into the exam room.  Neinstein died in 2016.

28.    Tyndall instructed some patients to return for examinations more often than was medically necessary.  Tyndall often prescribed only two months' worth of birth control pills, where most doctors prescribe a year's supply, and refused to refill a prescription unless the patient came back to see him.

29.    At the outset of his examinations, Tyndall groped women's vaginas for several minutes, even though it was not medically necessary, before inserting a speculum.  According to one chaperone who witnessed Tyndall's examinations, "He would put one finger in and say, 'Oh, I think it will fit.  Let's put two fingers in.'"  Tyndall inserted an entire hand into the vaginas of some of his patients.

30.    Tyndall told hundreds of women that they had a "tight muscle" and "must be a runner."  He referred explicitly to sexual intercourse while moving his fingers in and out of patients' vaginas.  He told many women that they shouldn't worry about their hymens being intact, as their boyfriends would "love" it.

31.    Tyndall fondled women's breasts, and photographed and examined their genital areas, unnecessarily and for no medical purpose.

32.    Tyndall carried out these acts without explaining to his patients why he was doing so.  He failed to obtain their informed consent to these acts.

33.    Tyndall made remarks to his patients that were racially discriminatory and offensive.

CLASS ACTION COMPLAINT
CASE NO.

34.     Many women Tyndall examined refused to make follow-up appointments with him, despite needing care.  Women told staff at USC's student health center that they were not comfortable seeing Tyndall again because he had violated them.

35.     In the early 2000s, several students sent letters to USC administrators reporting that Tyndall had touched them in an overtly sexual manner and made offensive remarks.  Those letters were read out loud during monthly meetings attended by administrators of USC's student health center.  Throughout Tyndall's tenure at USC, these and other university administrators adhered to a practice of ignoring, minimizing, and sanitizing complaints from sexual assault victims.

36.     Chaperones grew increasingly concerned about Tyndall's behavior after USC opened a new student health center in 2013.  By then, USC administrators, clinicians, nurses, and staff had received dozens of complaints about Tyndall's mistreatment and abuse of female patients.  Chaperones had repeatedly told USC administrators about Tyndall's offensive behavior and comments during medical examinations—e.g., that patients had "perky" breasts, "creamy" skin, and "beautiful" vaginas.

37.     In the spring of 2013, eight chaperones reported concerns about Tyndall to their supervisor, nurse Cindy Gilbert.  Gilbert contacted some patients and told them how to file a written complaint against Tyndall.  Some of those patients filed complaints, while others told Gilbert that they preferred to move on with their lives.

38.     Gilbert relayed the chaperones' concerns to Neinstein and to Tammie Akiyoshi, then in charge of clinic nursing and now the clinic's executive director.  Neinstein told Gilbert that he had spoken with Tyndall about his behavior before.

39.     Neinstein told Gilbert that he was referring the complaints to USC's Office of Equity and Diversity.  That office investigates sexual misconduct and racial and gender discrimination on campus.  Gilbert and several of the chaperones who had complained about Tyndall were not interviewed as part of the subsequent investigation. The investigation concluded that Tyndall had not violated university policy.  After the

6

CLASS ACTION COMPLAINT
CASE NO.

investigation, Neinstein told Tyndall to stop locking the door when he was in a room with a patient.  Neinstein took no other preventive or remedial measures as a result of the investigation.

42.     Chaperones also forwarded some complaints about Tyndall to Sandra Villafan, who in 2013 became the student health center's chief of quality and safety. Villafan relayed these complaints to clinic administrators and university leadership.

41.     In 2016, Gilbert spoke with Ekta Kumar, chief of USC's rape crisis center (known as Relationship and Sexual Violence Prevention and Services).  The investigation that followed eventually led to Tyndall leaving his position, without reprimand.

**C.     USC Did Not Respond Appropriately to Tyndall's Misconduct.**

42.     USC and its Board of Trustees suppressed, concealed, and failed to disclose Tyndall's misbehavior and otherwise failed to protect female students from being assaulted and abused by him.  For nearly 30 years, USC and its Board of Trustees allowed Tyndall to continue molesting women seeking medical care, despite widespread complaints about his behavior.

43.     In June 2017, USC allowed Tyndall to resign.  USC gave him a year's paid leave and did not report him to the state medical board.

44.     USC and its Board of Trustees have engaged in a pattern and practice of ignoring complaints, failing to investigate sexual harassment and abuse complaints, failing to hold perpetrators of sexual assault responsible for their misconduct, and deliberately concealing information from victims.

45.     USC has had a systemic problem with properly handling sexual harassment and sexual abuse allegations, contrary to its federal mandates under Title IX.  In 2013, the United States Department of Education opened an investigation into how USC responded to reports of on-campus rapes.  During this investigation, more than 100 USC students came forward to describe USC's "gross mishandling" of rape cases.  In 1992, a

CLASS ACTION COMPLAINT
CASE NO.

USC-commissioned panel of experts found that the university's response to sexual assault complaints "leaves victims feeling unsupported" and stripped of important rights.

46.    USC and its Board of Trustees knew, or reasonably should have known, of Tyndall's propensity to molest young female patients before he molested Plaintiff.  USC and its Board of Trustees knew, or reasonably should have known, of the high probability that Tyndall would molest student-patients with whom he came into contact, including Plaintiff.

47.    By USC's own admission, numerous documented complaints were lodged with USC regarding Tyndall's sexually abusive behavior.  These complaints go back to the earliest years of Tyndall's employment at USC.  Some of these complaints predate Tyndall's examination of Plaintiff.

48.    A USC-employed chaperone was present for a large percentage of the occasions on which Tyndall sexually abused female students at USC's student health center.  Chaperones witnessed his sexual abuse—yet did nothing to intervene.

49.    On May 15, 2018, USC issued a report concerning Tyndall's misconduct. The report noted that in June 2016, USC's Office of Equity and Diversity received a complaint from a staff member at the student health center that Tyndall was making sexual comments to patients in front of chaperones.  The report further noted that chaperones had expressed concerns about how Tyndall was conducting pelvic examinations, and in particular, his practice of inserting his fingers inside women's vaginas before inserting a speculum.

50.    The June 2016 complaint led USC to conduct an investigation into Tyndall's conduct.  An outside medical review firm, MD Review, informed USC that Tyndall's use of his fingers in his examination practice departed from the standard of care.

51.    USC stated that its investigation had revealed a box of photographs in Tyndall's office from 1990 and 1991 showing numerous images of female genitalia.

CLASS ACTION COMPLAINT
CASE NO.

52.    USC stated that Neinstein's files alone contained complaints from eight women concerning Tyndall's inappropriate conduct and statements during gynecological examinations.  USC acknowledged that these complaints were mishandled, should have been "elevate[d] . . . for proper investigation," and should have resulted in Tyndall's termination because he "violated the university's policy on harassment by making repeated racially discriminatory and sexually inappropriate remarks during patient encounters."

53.    "Several of the complaints" in Neinstein's files, USC admitted, "were concerning enough that it is not clear today why the former health center director permitted Tyndall to remain in his position."

54.    In 2017, USC began termination proceedings with Tyndall.  Tyndall threatened a wrongful termination lawsuit against USC.  USC then entered into a separation agreement with Tyndall under which he was allowed to resign with one year's pay.  USC entered into this agreement with the intent and effect of continuing to conceal Tyndall's misconduct from Plaintiff, the university community, and the public.

55.    At that time, and throughout Tyndall's tenure as a university doctor, USC did not contact the medical licensing board or any law enforcement agency or official regarding Tyndall's misconduct.  USC's failure to report Tyndall's assaultive or abusive conduct upon receiving complaints of such conduct from students and medical staff violated Section 11160 of the California Penal Code, which requires health practitioners to report instances of sexual battery, among other things.

56.    In early 2018, Tyndall sent a letter to USC asking to return to his position at the student health center.  Tyndall's letter prompted USC to report his improper conduct to the Medical Board of California.  Although USC had been on notice of Tyndall's misconduct for nearly 30 years, not until March 9, 2018, did USC disclose it to authorities.

CLASS ACTION COMPLAINT
CASE NO.

57. In a pair of May 15, 2018, statements, high-ranking USC officials acknowledged Tyndall's decades-long pattern of abuse and USC's failure to adequately respond to the reported misconduct and protect its students.

58. First, in a public letter to the USC community, then-president C.L. Max Nikias addressed the "deeply troubling" events surrounding Tyndall. According to Nikias, "the manner in which Dr. Tyndall performed physical exams did not meet current practice standards" and "he made inappropriate remarks to patients, in some cases during the examination process. Some of these comments were racially discriminatory and sexually inappropriate in nature."

59. Nikias acknowledged that "there had been complaints about Dr. Tyndall in prior years" and that "we have no doubt that Dr. Tyndall's behavior was completely unacceptable. It was clear violation of our Principles of Community, and a shameful betrayal of our values."

60. Nikias advised that USC was implementing structural changes to improve its complaint handing and investigation processes. He apologized to "any student who may have visited the student health center and did not receive the respectful care each individual deserves."

61. Second, USC's Chief Health Officer, Sarah Van Orman, stated in a public letter to USC's students that she was "deeply troubled" by the events surrounding Tyndall and referencing "significant changes" that had "professionalized [USC's] care." Van Orman reassured students that she is personally responsible for "[g]overnance and oversight of these practitioners and all care delivered at student health centers[,]" which "ensures responsible and transparent health care services."

62. Van Orman emphasized new, "extensive training on staffing and complaint reporting . . . to ensure that when concerning behavior and actions are noticed, they are quickly reported and addressed." She further stated that "[w]e plan to strengthen our . . . mechanisms for reporting concerns."

CLASS ACTION COMPLAINT
CASE NO.

63.    On May 18, 2018, Nikias said in another public statement that Tyndall's "behavior distresses us deeply.  He should have been removed and referred to the authorities years ago."

64.    "[H]ow could this behavior have gone on for so long?" Nikias continued. "Once again, I want to personally apologize to any student who visited our student health center and was made to feel uncomfortable . . . . You deserved better, and we let you down."

65.    Nikias resigned as president on May 25, 2018.  In an accompanying statement, USC's Board of Trustees admitted that "something is broken" in regard to USC's response to Tyndall's predatory treatment of the women under its care.

## AGENCY, ALTER EGO, AND CONSPIRACY ALLEGATIONS

66.    At all relevant times, Tyndall was an employee, agent, and/or servant of USC and its Board of Trustees, was under their complete control and active supervision, and operated within the scope of his employment by them.

67.    Defendants engaged in, joined in, and conspired with each of the other Defendants and wrongdoers in carrying out the tortuous and unlawful activities herein described.  Each Defendant is legally responsible for the occurrences herein alleged, and Plaintiff's damages, as herein alleged, were proximately caused by all Defendants.

68.    At all relevant times, there existed a unity of interest and ownership among Defendants such that any individuality or separateness between or among them ceased to exist.  Defendants and each of them were the alter egos of all of the other Defendants, in that they dominated and controlled each other without any separate identity, observation of formalities, or other manner of division.

69.    At all relevant times, each Defendant was the agent, representative, and/or employee of each of the other Defendants.  In engaging in the conduct herein alleged, Defendants, and each of them, were acting within the course and scope of that alternative personality, capacity, identity, agency, representation, and/or employment and were within the scope of their authority, whether actual or apparent.

11

CLASS ACTION COMPLAINT
CASE NO.

70.     At all relevant times, each Defendant was the trustee, partner, servant, joint venturer, shareholder, contractor, and/or employee of each and every other Defendant, and the acts and omissions herein alleged were done by them through such capacity and within the scope of their authority, and with the permission and consent of each and every other Defendant.  Such conduct was ratified by each and every other Defendant, and each of them is jointly and severally liable to Plaintiff.

## TOLLING OF THE STATUTES OF LIMITATIONS

71.     The statute of limitations for each of Plaintiff's causes of actions was equitably tolled, and Defendants are equitably estopped from asserting the statute of limitations as a defense, by reason of their wrongful conduct.

72.     USC and its Board of Trustees acted wrongfully by ignoring and actively concealing myriad complaints of sexual misconduct lodged against Tyndall, and breached mandatory duties owed to Plaintiff by continue to employ Tyndall and by failing to warn Plaintiff of his proclivity to molest young female patients.

73.     USC and its Board of Trustees received complaints of Tyndall's sexually abusive conduct, and knew of Tyndall's dangerous propensity to sexually abuse his young female patients, in the early 1990s and thereafter.  USC and its Board of Trustees wrongfully concealed these complaints, causing Plaintiff and other female patients to suffer assault at the hands of Tyndall, by holding him out as a trustworthy doctor and employing him as the student health center's only full-time gynecologist.

74.     USC benefited financially from retaining Tyndall as an employee at its student health center: USC offered his health care services to USC's female students at their own expense.  By assigning and employing Tyndall as the only full-time gynecologist at USC's student health center, USC represented to its students, and the community, that Tyndall was a safe and trustworthy doctor such that students and patients need not worry about Tyndall interacting with and providing care to them.  USC did so to protect its own public image and so that it could retain past students, recruit new students, and gain and preserve sources of financial support.

CLASS ACTION COMPLAINT
CASE NO.

75.    USC also benefited financially—by protecting its reputation and financial endowment—as the intended result of its active, wrongful concealment of complaints of Tyndall's sexual abuse.  USC's deliberate concealment included paying Tyndall a financial settlement so that he would quietly resign, after USC's 2016 investigation revealed that Tyndall routinely made sexually and racially offensive comments to patients, kept a secret box containing photographs of his patients' genitals, and had been the subject of serious and credible complaints for many years.  USC paid Tyndall this financial settlement in a deliberate attempt to conceal from Plaintiff and the public that Tyndall was a serial sexual predator, in order to insulate itself from liability and avoid reputational damage.

76.    As part of Defendants' wrongful attempt to conceal Tyndall's propensity to sexually abuse young female students, and his past sexual abuse, from public scrutiny and criminal investigation, Defendants implemented various measures with the intent and effect of making Tyndall's conduct harder to detect and ensuring that other student-patients with whom he came into contact, including Plaintiff, would be sexually abused and assaulted, including:

a.    Permitting Tyndall to remain in a position of authority and trust after Defendants knew or should have known that he molested his young female patients;

b.    Scheduling female patients for appointments with Tyndall, including appointments without a nurse or chaperone present, despite being aware of his improper conduct;

c.    Placing Tyndall in a separate and secluded environment at the university health center, and granting him unfettered access to and control over patients even when he was purporting to provide extremely sensitive gynecological treatment, thereby allowing Tyndall to physically and sexually interact with young female students at USC, including Plaintiff;

CLASS ACTION COMPLAINT
CASE NO.

d.     Holding out Tyndall to Plaintiff, other USC patients, USC alumni, and the public at large as a trustworthy person of good moral character who was capable and worthy of being granted unsupervised access to the student-patients of USC;

e.     Failing to disclose and actively concealing Tyndall's prior record of misconduct, sexual abuse, harassment, and molestation, and his propensity to commit such acts towards student-patients in the university health center, from its students, the public at large, and law enforcement;

f.     Failing to investigate or otherwise confirm or deny such facts about Tyndall, including prior complaints, claims, and investigations relating to sexual abuse suffered at his hands;

g.     Failing to implement reasonable safeguards to avoid acts of unlawful sexual conduct by Tyndall, such as by avoiding placement of Tyndall in functions or environments in which he would necessarily have intimate contact with young female patients; and

h.     Failing to implement systems or procedures to supervise or monitor doctors, chaperones, and other USC agents to ensure that they did not molest or abuse patients in Defendants' care and, further, that they report all reasonable suspicions of sexual assault or battery to law enforcement as mandated by Section 11160 of the California Penal Code.

77.     By consequence of the threatening and frightening conduct of Tyndall, Plaintiff was coerced into not talking about the abusive acts she endured.  She came forward only once the coercive nature of his acts subsided and became apparent to her, due to USC's and the media's revelation of his pattern of misconduct and the subsequent police investigation allowing such victims, including Plaintiff, to come forward without fear of reprisal by Defendants.

78.     Plaintiff was sexually abused by Tyndall in the presence of a nurse or chaperone employed by USC, and USC actively concealed numerous complaints of Tyndall's sexually abusive behavior in order to deceive Plaintiff into believing that his

14

CLASS ACTION COMPLAINT
CASE NO.

sexual abuse was a legitimate medical treatment.  Tyndall's conduct in relation to Plaintiff was intended to, and did, shame, humiliate, and embarrass Plaintiff to her substantial psychological and emotional detriment, coercing her from disclosing the abuse to USC.  By his conduct and statements, Tyndall falsely represented to Plaintiff that his acts were for the proper purpose of conducting a vaginal examination, that digital penetration of a woman's vagina at the outset of a gynecological examination was medically necessary, and that his acts conformed to accepted medical practice.  In reliance upon these representations, and the fact that Tyndall was a USC-employed doctor, Plaintiff at all times trusted that Tyndall had provided her with legitimate medical treatment.

79.    Plaintiff has never been a medical professional or had any specialized medical training, and hence did not discover and could not have reasonably discovered her abuse at an earlier date than she did.  Plaintiff was led to believe that Tyndall's sexual abuse was not, in fact, sexual abuse, but rather was legitimate gynecological treatment because a USC-employed nurse or chaperone witnessed the sexual abuse yet did nothing to intervene.  Further, immediately after the abusive incident, Plaintiff attempted to report Tyndall's misconduct to another employee of USC's student health center, but was led to believe that her complaint had no merit.  No one from USC contacted Plaintiff about her complaint or otherwise took action against Tyndall.

80.    Only in May 2018, when Tyndall's rampant sexual mistreatment of young female USC students was nationally publicized in the media, did Plaintiff come to learn that Tyndall's treatment of her was not a legitimate medical treatment, but rather was sexual assault, committed for his own gratification.  Only in May 2018, moreover, did Plaintiff learn that the university had received—and wrongfully ignored—dozens of complaints about Tyndall.

81.    Prior to the recent revelation of Tyndall's conduct, Plaintiff did not discover, and could not have reasonably discovered, USC's notice and wrongful concealment of Tyndall's pattern of abusive conduct.

CLASS ACTION COMPLAINT
CASE NO.

82.     Plaintiff was ignorant of the true facts related to her abuse until it was revealed in May 2018.  Not until May 2018, when the allegations of Tyndall's sexual misconduct received national media attention and became public knowledge, did Plaintiff know or have any reason to know of her claims against Defendants.  Not until then could Plaintiff have reasonably discovered that USC had notice of Tyndall's misconduct but failed to stop it.  Plaintiff's claims therefore accrued in May 2018.

## CLASS ACTION ALLEGATIONS

83.     Plaintiff brings this action under Federal Rule of Civil Procedure 23 on behalf of a class of all women who were examined by George Tyndall, M.D. at the University of Southern California.  Excluded from this class are counsel for plaintiff and their employees and immediate family members, and all judges assigned to this case and their staffs and immediate family members.

84.     The requirements of Federal Rule of Civil Procedure 23(a), (b)(3), and/or (c)(4) are satisfied in this case.

85.     Numerosity (Fed. R. Civ. P. 23(a)(1)).  Joinder of the class members in a single litigation is not practicable.  There are at least hundreds of individuals in the class. Their identities can be readily determined from records in USC's possession.

86.     Commonality and Predominance (Fed. R. Civ. P. 23(a)(2), (b)(3)). Questions of law and fact common to class members predominate over any questions that may affect only individual class members.  Questions of law and fact common to the class include, without limitation:

a.      Whether Tyndall committed sexual assault and battery;

b.      Whether Tyndall violated the law during and within the scope of his employment at USC;

c.      Whether the USC Defendants knew or reasonably should have known of Tyndall's misconduct;

d.      Whether the USC Defendants' actions and inaction in response to such knowledge were reasonably tailored to prevent foreseeable harm;

CLASS ACTION COMPLAINT
CASE NO.

e.    Whether the USC Defendants acted negligently, including with respect to training and supervising Tyndall and preventing future injuries committed by him;

f.    Whether the USC Defendants are legally responsible for Tyndall's conduct under principles of respondeat superior; and

g.    Whether Defendants acted to suppress, minimize, and deter complaints about Tyndall's predatory behavior.

87.    Typicality (Fed. R. Civ. P. 23(a)(3)).  Plaintiff's claims are typical of the claims of the class.  The same legal doctrines and the same pattern and practice of sexual assault, battery, and harassment give rise to the claims of all class members.

88.    Adequacy of representation (Fed. R. Civ. P. 23(b)(3)).  Plaintiff will fairly and adequately protect the interests of the class.  Plaintiff has no interests antagonistic to the interests of other class members and is committed to vigorously prosecuting this action on their behalf.  Plaintiff has retained counsel experienced in prosecuting class actions, including under California law.

89.    Superiority (Fed. R. Civ. P. 23(b)(3)).  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Because the amount of each individual class member's claim is small relative to the complexity of the litigation, and because of USC's financial resources, many class members are unlikely to pursue legal redress individually for the violations detailed in this complaint.  Classwide adjudication of common questions, such as USC's legal responsibility for Tyndall's conduct, is superior to multiple individual actions and will conserve judicial and party resources while promoting consistency of adjudication.

90.    Common issues (Fed. R. Civ. P. 23(c)(4)).  Plaintiff's claims, and the claims of all class members, are comprised of common issues that may be efficiently adjudicated in a single proceeding.

CLASS ACTION COMPLAINT
CASE NO.

## **FIRST CAUSE OF ACTION**
**Violations of Title IX**
**20 U.S.C. § 1681(a), *et seq.***
**(Against the USC Defendants)**

91.     Plaintiff incorporates the above allegations by reference.

92.     Under Title IX of the Education Amendments Act of 1972, "No person in the United States shall on the basis of sex, be . . . subject to discrimination under any education program or activity receiving Federal financial assistance . . . ."

93.     Plaintiff is a "person" under Title IX.

94.     Plaintiff was subjected to sexual abuse, harassment, and discrimination by Tyndall's intentional conduct.

95.     USC receives federal financial assistance for its education program and is therefore subject to Title IX.

96.     Title IX requires USC to investigate allegations of sexual assault, sexual abuse, and sexual harassment.

97.     Tyndall's conduct constitutes sexual harassment, abuse, and assault, and sex discrimination, under Title IX.

98.     The USC Defendants were on notice of Tyndall's conduct alleged herein and had authority to institute corrective measures, but failed to investigate that conduct and take corrective action as required by Title IX.

99.     The USC Defendants were deliberately indifferent to a substantial risk of sexual abuse to its students, including Plaintiff, in that the USC Defendants had actual knowledge of Tyndall's misconduct, and responded unreasonably in failing to terminate his employment, publicize his misconduct, and remove him from a situation in which he could and would continue abusing USC's student-patients.

100.   The USC Defendants' failure to investigate Tyndall's conduct and take corrective action, as required by Title IX, was a substantial factor in causing damage to Plaintiff.  As a direct and proximate result of the USC Defendants' violations of Title IX,

CLASS ACTION COMPLAINT
CASE NO.

Plaintiff suffered harm, including shock, fright, distress, grief, and anguish, in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### Violations of the Unruh Act
### Cal. Civ. Code § 51
### (Against the USC Defendants)

101.    Plaintiff incorporates the above allegations by reference.

102.    While a student at USC, Plaintiff had the rights to be free from gender discrimination, sexual molestation, abuse, and harassment under the Unruh Act. The USC Defendants violated these civil rights of Plaintiff when they intentionally concealed from Plaintiff complaints of sexual abuse, molestation and harassment by Tyndall.

103.    Defendants were acting under the color of their authority and in the scope of their employment, during the subject incident, during which Plaintiff was a student-patient at USC.

104.    The USC Defendants denied Plaintiff full and equal accommodations, advantages, facilities, privileges and health-care services because of her gender, by allowing Tyndall unfettered access to sexually abuse Plaintiff, through his position of authority as the USC student health center's sole full-time gynecologist with regular availability, and by actively concealing from Plaintiff their knowledge that Tyndall was engaged in serial sexual predation.

105.    By employing and retaining Tyndall as the sole full-time gynecologist with regular availability in the USC student health center, despite their knowledge of myriad reports of Tyndall's sexually abusive conduct, the USC Defendants coerced its female students to seek necessary medical treatment from Tyndall, thereby exposing Plaintiff to sexual abuse at his hands. The USC Defendants' retention of and failure to discipline Tyndall denied Plaintiff full and equal access to safe medical facilities, treatment, and services on the basis of her gender.

CLASS ACTION COMPLAINT
CASE NO.

106.    The substantial motivating reason for the USC Defendants' active concealment of numerous complaints of Tyndall's sexually abusive conduct was Plaintiff's gender.  The USC Defendants knew that only female students would seek gynecological treatment from Tyndall and, thus, that only they would be unwittingly subjected to his sexual assaults.

107.    As a direct and proximate result of the USC Defendants' violations of the Unruh Act, Plaintiff suffered harm, including shock, fright, distress, grief, and anguish, in an amount to be determined at trial.

## THIRD CAUSE OF ACTION
**Sexual Abuse and Harassment in the Educational Setting**
**Cal. Ed. Code §§ 220, 66270 *et seq.***
**(Against All Defendants)**

108.    Plaintiff incorporates the above allegations by reference.

109.    Plaintiff was harmed by being subjected to sexual abuse, harassment and molestation at USC because of her gender.  Provisions of the California Education Code render Defendants liable for that harm.

110.    Sections 220 and 66270 of the California Education Code prohibit discrimination on the basis of gender "in any program or activity conducted by any postsecondary educational institution that receives, or benefits from, state financial assistance or enrolls students who receive state student financial aid."

111.    USC enrolls students who receive state student financial aid.

112.    Plaintiff suffered abuse at the hands of Tyndall that was sufficiently severe, pervasive, and offensive as to constitute sexual discrimination and deprive her of the right of equal access to educational benefits and opportunities.  Tyndall is liable for these violations committed by him.

113.    At the time Plaintiff experienced this abuse and harassment, Defendants had actual knowledge that Tyndall was sexually abusing and harassing women at USC's student health center.  USC, by and through its employees, witnessed Tyndall's abuse of

CLASS ACTION COMPLAINT
CASE NO.

Plaintiff firsthand.  A USC-employed nurse or chaperone was in the room when he forcibly thrust his fingers in and out of her.  The USC Defendants also received, and then actively suppressed and ignored, numerous complaints of Tyndall's sexual abuse, including complaints that predated his assault and battery of Plaintiff.

114.   In the face of this knowledge of sexual abuse, harassment, and molestation that Tyndall was perpetrating upon women like Plaintiff, the USC Defendants acted with deliberate, callous indifference by failing to respond to these alarms and prevent further abuse.  Their response to Tyndall's pattern of abuse and harassment was clearly unreasonable in light of the known circumstances.

115.   The USC Defendants allowed Tyndall to stay on as a university doctor and continue to sexually harass, abuse, and molest other patients.  Not until June 2017, when the USC Defendants allowed Tyndall to resign and paid him a substantial sum, did Tyndall's sexual abuse of female USC students finally end.

116.   Section 66292.4 of the California Education Code confers a private right of action upon Plaintiff.

117.   As a direct and proximate result of Defendants' sexual abuse and harassment in the educational setting, Plaintiff suffered harm, including shock, fright, distress, grief, and anguish, in an amount to be determined at trial.

### FOURTH CAUSE OF ACTION
**Gender Violence**
**Civil Code § 52.4**
**(Against Tyndall)**

118.   Plaintiff incorporates the above allegations by reference.

119.   Tyndall's acts committed against Plaintiff, including his sexual harassment, molestation, and abuse of her, constitute gender violence and sex discrimination.

120.   One or more of Tyndall's acts would constitute a criminal offense under California law that has as an element the use, attempted use, or threatened use of physical force against the person of another, committed in part based on the gender of

21

CLASS ACTION COMPLAINT
CASE NO.

the victim, whether or not those acts have resulted in criminal complaints, charges, prosecution, or conviction.  Tyndall's conduct caused a physical intrusion and invasion of a sexual nature to Plaintiff under coercive conditions, whether or not such conduct has resulted in criminal complaints, charges, prosecution, or conviction

121.   As a direct and proximate result of Tyndall's violations of Civil Code Section 52.4, Plaintiff suffered harm, including shock, fright, distress, grief, and anguish, in an amount to be determined at trial.

122.   Tyndall's acts of gender violence against Plaintiff entitle her to actual damages, compensatory damages, punitive damages, and an award of reasonable attorney's fees and costs under Section 52.4 of the California Civil Code.

## FIFTH CAUSE OF ACTION
### Sexual Assault
### (Against Tyndall)

123.   Plaintiff incorporates the above allegations by reference.

124.   Tyndall, in subjecting Plaintiff to sexual abuse and molestation during her time as a USC student, including through unwanted, painful, and frightening groping of her vagina, during the course and scope of his employment by the USC Defendants, intended to and did cause a harmful and sexually offensive contact with her person and place her in imminent apprehension of such contact.

125.   During the aforementioned incident, Plaintiff suffered a harmful and offensive contact from Tyndall, was placed in imminent apprehension of a harmful and sexually offensive contact by him, and believed that he had the ability to make a harmful and offensive contact with her person.

126.   At no point did Plaintiff consent to Tyndall's harmful or sexually offensive contact with her person, or to being placed by him in imminent apprehension of such contact.  Due to Tyndall's age and position of authority, Plaintiff's physical seclusion, her young age, her mental and emotional state, and the inaction of the nurse or

CLASS ACTION COMPLAINT
CASE NO.

chaperone who witnessed the incident, Plaintiff was unable to, did not, and could not consent to Tyndall's acts.

127.   In doing the things herein alleged, Tyndall violated Plaintiff's right, pursuant to Section 43 of the California Criminal Code, of protection from bodily restraint or harm and from personal insult.  In doing the things herein alleged, Tyndall violated his duty, pursuant to Section 1708 of the California Civil Code, to refrain from injuring the person of Plaintiff and infringing her rights.

128.   As a direct and proximate result of Tyndall's sexual assault, Plaintiff suffered harm, including shock, fright, distress, grief, and anguish, in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION
### Sexual Battery,
### Cal. Civ. Code § 1708.5
### (Against Tyndall)

129.   Plaintiff incorporates the above allegations by reference.

130.   During the course and scope of his employment with the USC Defendants, Tyndall intentionally, recklessly and wantonly committed acts which were intended to, and did, result in harmful and sexually offensive contact with intimate parts of Plaintiff's person, including through unwanted, painful, and frightening groping of her vagina.

131.   Tyndall committed the aforementioned acts with the intent to cause a harmful or sexually offensive contact with an intimate part of Plaintiff's person.  These acts would offend a reasonable sense of personal dignity.

132.   At no point did Plaintiff consent to Tyndall's acts.  Due to Tyndall's age and position of authority, Plaintiff's physical seclusion, her young age, her mental and emotional state, and the inaction of the nurse or chaperone who witnessed the incident, Plaintiff was unable to, did not, and could not consent to Tyndall's acts.

CLASS ACTION COMPLAINT
CASE NO.

133.   As a direct and proximate result of Tyndall's sexual battery, Plaintiff suffered harm, including shock, fright, distress, grief, and anguish, in an amount to be determined at trial.

### SEVENTH CAUSE OF ACTION
**Sexual Harassment**
**Cal. Civ. Code § 51.9**
**(Against the USC Defendants)**

134.   Plaintiff incorporates the above allegations by reference.

135.   While Plaintiff was a student at USC, Tyndall intentionally, recklessly and wantonly made sexual advances and demands for sexual compliance of a hostile nature, based on her gender, that were unwelcome, pervasive, and severe, including groping and fondling her vagina, under the supervision of the USC Defendants, who were acting in the course and scope of their agency with Defendants and each of them.

136.   The incident of abuse described herein occurred while Plaintiff was under the control of Tyndall and of the USC Defendants in their capacity and position as supervisors of doctors, medical professionals, and staff at USC, and while acting specifically on behalf of Defendants.

137.   While Plaintiff was a student at USC, Tyndall intentionally, recklessly and wantonly committed acts which resulted in harmful and offensive contact with intimate parts of Plaintiff's person, including using his age and position of authority to force Plaintiff to submit to Tyndall's sexual assault, battery, and suggestions.

138.   Because of Tyndall's age and position of authority, Plaintiff's physical seclusion, her young age, her mental and emotional state, and the inaction of the nurse or chaperone who witnessed the incident, Plaintiff was unable to, did not, and could not terminate the encounter or give consent to Tyndall's acts.

139.   The USC Defendants knew or should have known of these activities by Tyndall prior to Plaintiff's appointment with him.  The USC Defendants failed to

CLASS ACTION COMPLAINT
CASE NO.

investigate, supervise, or monitor Tyndall to ensure Plaintiff's safety while she was in their charge.

140.   A corporation is a "person" within the meaning of Section 51.9 of the California Civil Code.  This section subjects persons to liability for sexual harassment within a business, service, or professional relationship, and an entity defendant may be held liable under this section for the acts of its employees.  Principles of ratification also apply when the principal ratifies the agent's originally unauthorized harassment.

141.   The USC Defendants' conduct, and that of their agents, was a breach of their duties to Plaintiff under Section 51.9 of the California Civil Code.

142.   As a direct and proximate result of the USC Defendants' sexual harassment, Plaintiff suffered harm, including shock, fright, distress, grief, and anguish.

143.   Plaintiff is entitled to damages as provided by Section 52(b) of the California Civil Code.

**EIGHTH CAUSE OF ACTION**
**Intentional Infliction of Emotional Distress**
**(Against All Defendants)**

144.   Plaintiff incorporates the above allegations by reference.

145.   Defendants' conduct toward Plaintiff, as described herein, was outrageous and extreme.

146.   A reasonable person would not expect or tolerate the sexual harassment, molestation, and abuse of Plaintiff by Tyndall and the USC Defendants' knowledge and callous indifference thereof.  Plaintiff had great trust, faith, and confidence in Defendants, which, by reason of their wrongful conduct, turned to fear.

147.   A reasonable person would not expect or tolerate the USC Defendants' retaining of Tyndall in a position of care with respect to Plaintiff and other patients.  At the time of the subject incident, the USC Defendants knew that Tyndall had physically and sexually abused student-patients.  The USC Defendants' condoning of Tyndall's reported misbehavior enabled him to have access to Plaintiff and other patients, and

CLASS ACTION COMPLAINT
CASE NO.

resulted in his commission of wrongful sexual acts, including the conduct described herein, with young female students, including Plaintiff.

148.  A reasonable person would not expect or tolerate the USC Defendants and their agents to be unable to stop agents of the USC Defendants, including Tyndall, from committing wrongful sexual acts with patients, including Plaintiff, or to properly supervise, restrain, and discipline Tyndall.

149.  Tyndall's conduct described herein was intentional, malicious, and done for the purpose of causing, and with the substantial certainty that Plaintiff would suffer, humiliation, mental anguish, and emotional and physical distress.

150.  The USC Defendants acted with reckless disregard of the probability that Plaintiff would suffer emotional distress, knowing that Plaintiff was a USC student at the time that Tyndall's pattern of wrongful and abusive conduct was ongoing.

151.  As a direct and proximate result of Defendants' intentional conduct set forth herein, Plaintiff severe suffered emotional distress and is entitled to appropriate damages.  Defendants' conduct was a substantial factor in causing Plaintiff to experience suffering at a level no reasonable person should have to endure.

## NINTH CAUSE OF ACTION
### Negligence and/or Gross Negligence
### (Against the USC Defendants)

152.  Plaintiff incorporates the above allegations by reference.

153.  Prior to Tyndall's sexual molestation and harassment of Plaintiff, the USC Defendants knew or reasonably should have known of Tyndall's propensity to molest and harass female students during gynecological examinations.

154.  Prior to Tyndall's sexual molestation and harassment of Plaintiff, Tyndall failed to follow protocol, including by resisting the use of chaperones, by repeatedly taking medically unnecessary photographs of female patients' genitalia, and by physically groping their sensitive regions.

CLASS ACTION COMPLAINT
CASE NO.

155.    Prior to Tyndall's sexual molestation and harassment of Plaintiff, the USC Defendants received a substantial volume of complaints from patients, nurses, and/or chaperones regarding Tyndall's inappropriate behavior.

156.    Plaintiff's care, welfare, and physical custody were entrusted to the USC Defendants, and they voluntarily accepted the accompanying obligations.  The USC Defendants owed Plaintiff—a young student-patient—a special duty of care, particularly in the vulnerable context of a gynecological examination.  The USC Defendants' duty to protect and warn arose from the special, confidential, and fiduciary relationship between Defendants and Plaintiff.

157.    The USC Defendants breached their duties of care to Plaintiff by, among other things:

> a.    allowing Tyndall to come into contact with her;

> b.    allowing Tyndall to come into contact with her without effective supervision;

> c.    failing to prevent Tyndall from committing wrongful sexual acts with medical patients, including Plaintiff;

> d.    failing to appropriately train Tyndall;

> e.    failing to appropriately monitor and supervise Tyndall;

> f.    continuing to employ Tyndall after reports of his improper conduct emerged in the early 1990s;

> g.    failing to sufficiently investigate the widespread and pervasive reports of sexual abuse by Tyndall;

> h.    failing to take necessary preventive and remedial actions in response to the numerous complaints regarding Tyndall;

> i.    failing to implement systems or procedures reasonably geared to ensure female students would not be abused at the university health clinic;

27

CLASS ACTION COMPLAINT
CASE NO.

j.      failing to disclose Tyndall's propensity for sexual violation to Plaintiff, the public, and law enforcement, or otherwise warn Plaintiff and other potential victims of the risk of harm;

k.      allowing Tyndall to continue in a position of trust and authority, in which he could, and foreseeably would, do great damage to young women, even after being alerted as to his past wrongdoing;

l.      actively concealing from Plaintiff, the public, and law enforcement that Tyndall was sexually harassing and molesting patients; and

m.      holding Tyndall out to Plaintiff as being trustworthy and of good character.

158.   The USC Defendants' breaches of their duties of care to Plaintiff foreseeably harmed her and constitute gross negligence.

159.   The USC Defendants' acts and omissions constitute an extreme departure from what reasonably careful university leaders would do in the same situation to prevent molestation and harassment of students under their care.  The USC Defendants acted willfully, wantonly, and with conscious and reckless disregard for the rights and interests of Plaintiff.  Their acts and omissions had a great probability of causing considerable harm and in fact did.

160.   As a direct and proximate result of the USC Defendants' negligence and gross negligence, Plaintiff is entitled to damages in an amount to be determined at trial.

## TENTH CAUSE OF ACTION
### Ratification
### (Against the USC Defendants)

161.   Plaintiff incorporates the above allegations by reference.

162.   Tyndall was an agent and employee of USC between 1989 and 2016.

163.   At all relevant times, Tyndall was acting, or purporting to act, as an agent of and on behalf of USC.

CLASS ACTION COMPLAINT
CASE NO.

164.    During instances of Tyndall's abuse of his patients, including of Plaintiff, Tyndall purported to act on behalf of the USC Defendants.

165.    The USC Defendants learned of Tyndall's pattern of unauthorized conduct, and all of the material facts involved in the relevant events after they occurred.

166.    USC and its Board of Trustees ratified all acts and omissions described herein.  Many USC administrators and employees, including nurses and chaperones in the student health center, knew that Tyndall was molesting female students.  They failed to take appropriate actions to stop him.  They actively concealed his transgressions.  The inaction of the USC Defendants enabled the sexual abuse and assault of Plaintiff and hundreds of women like her.

167.    In failing to take corrective action to prevent further misconduct by Tyndall, the USC Defendants voluntarily retained benefits accruing from Tyndall's misconduct after they learned of it.

168.    Imputing liability to USC advances the purposes of respondeat superior—it would be unjust for the US Defendants to disclaim responsibility for injuries occurring during the course of Tyndall's activities as a physician at USC's student health center.  It will prevent future harm and assure compensation to victims.

169.    The USC Defendants bear legal responsibility for Tyndall's wrongful acts. Plaintiff is entitled to damages from the USC Defendants in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the class, respectfully request that this Court:

A.    Certify the class under Federal Rule of Civil Procedure 23, appoint Plaintiff as class representative, and appoint her attorneys as class counsel;

B.    Enter judgment against Defendants and in favor of Plaintiff and the class;

C.    Award appropriate damages to Plaintiff and the class;

D.    Award reasonable attorneys' fees and costs.

CLASS ACTION COMPLAINT
CASE NO.

## DEMAND FOR JURY TRIAL

Under Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all issues so triable.

Dated: June 8, 2018                    Respectfully submitted,

                                       By:    /s/  *Elizabeth A. Kramer*


                                       Daniel C. Girard (State Bar No. 114826)
                                       Jordan Elias (State Bar No. 228731)
                                       Adam E. Polk (State Bar No. 273000)
                                       Elizabeth A. Kramer (State Bar No. 293129)
                                       **GIRARD GIBBS LLP**
                                       601 California Street, Suite 1400
                                       San Francisco, California 94108
                                       Telephone: (415) 981-4800
                                       Facsimile:  (415) 981-4846
                                       Email: dcg@girardgibbs.com
                                       Email: je@girardgibbs.com
                                       Email: aep@girardgibbs.com
                                       Email: eak@girardgibbs.com

                                       *Counsel for Plaintiff*

CLASS ACTION COMPLAINT
CASE NO.